UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| HERBERT SHEDD,<br><br>         Petitioner,<br><br>  v.<br><br>GEORGE A. NEOTTI, Warden,<br><br>         Respondent. | Civil No. 09-cv-2065-JLS (POR)<br><br>**REPORT AND RECOMMENDATION DENYING PETITION FOR WRIT OF HABEAS CORPUS**<br><br>**[Document No. 1 ]** |

## I. INTRODUCTION

On September 21, 2009, Petitioner, a state prisoner proceeding *pro se*, filed a Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254. (Doc. 1.) Petitioner contends the Board of Parole Hearings' decision finding him unsuitable for parole violated his due process rights because there was no evidence to support the Board's decision, the Board erred by relying on the immutable factor of his commitment offense, and the Board failed to give proper weight to factors favoring his release on parole. (Id. at 7-18.)

On January 27, 2010, Respondent filed an Answer.[1] (Doc. 9.) Respondent contends Petitioner is not entitled to relief because his claims merely allege a disagreement with the Board's

---

[1] When Petitioner filed his Petition and Respondent filed his answer, the Ninth Circuit's en banc decision on rehearing of Hayward v. Marshall, 603 F.3d 546 (9th Cir. 2010) (en banc) had not yet issued. The en banc decision issued on April 22, 2010, and answers the question "whether federal constitutional law imposes on the states a requirement for some quantum of evidence to support a state's denial of parole," and "whether, even if there is no general federal quantum of evidence requirement, applicants for parole in California, under the state's current laws, may obtain federal habeas review of whether there is 'some evidence' supporting a negative parole decision." Hayward, 603 F.3d at 549. Despite the fact neither the Petition nor the Answer address the clarified review standards, this Court shall reach the merits of Petitioner's due process claim.

decision, and Petitioner fails to establish the state court decisions denying his claims were contrary to, or an unreasonable application of, clearly established federal law as determined by the United States Supreme Court, or were based on an unreasonable determination of the facts. (Id. at 4.)

On February 23, 2010, Petitioner filed his Traverse. (Doc. 11.) Petitioner contends the Board failed to demonstrate Petitioner's release on parole poses an unreasonable risk of danger to public safety. (Doc. 11 at 2.) Specifically, Petitioner contends the Board failed to state a nexus between its findings and Petitioner's current public safety risk. (Id.)

In consideration of the record and controlling authority, for the reasons discussed below, the Court hereby RECOMMENDS the Petition be **DENIED**.

## II. FACTUAL AND PROCEDURAL BACKGROUND

### A. Factual Background

This Court gives deference to state court findings of fact and presumes them to be correct; Petitioner may rebut the presumption of correctness, but only by clear and convincing evidence. 28 U.S.C.A. § 2254(e)(1) (West 2006); see also Parke v. Raley, 506 U.S. 20, 35-36 (1992) (holding findings of historical fact, including inferences properly drawn from these facts, are entitled to statutory presumption of correctness). The only reasoned state court decision to address the merits of Petitioner's due process challenge to the July 2008 denial of parole is from the Los Angeles County Superior Court. (Lodgment 3.) The Court summarized:

> The Petitioner was received in the Department of Corrections on February 20, 1991 after conviction for murder in the first degree. He was sentenced to 25 years to life. His minimum parole eligibility date was November 23, 2005.
>
> The record reflects that in November of 1988, the Petitioner assisted his crime partner in beating and strangling the victim, Kelly Beasley, to death and then in disposing of her body. The Petitioner and his crime partner were drug dealers who worked together. The victim was supposed to sell drugs for the Petitioner's crime partner, but came back without the drugs given to her, or any money. Witnesses testified that the Petitioner beat her for this and threatened her life and his crime partner tied her up and placed her under a table. The next day, the Petitioner's crime partner again sent the victim to sell some drugs, but she again returned without the drugs or money. The Petitioner and his crime partner then beat her, tied her up, gagged her, and placed her in a bathtub where they beat her for approximately 30 minutes and strangled her with an electrical cord. The victim died as a result of the beating and strangulation. After she died, the Petitioner and his crime partner wrapped her body in a blanket, placed her in a trash bag and drove her to Griffith Park, where they left her body. The Petitioner claims he only participated in disposing of the victim's body, which was contradicted by witness statements. He admits to being under the influence of cocaine and alcohol at the time of the offense.

> The Board found the Petitioner unsuitable for parole after a parole consideration hearing held on July 9, 2008. The Petitioner was denied parole for two years. The Board concluded that the Petitioner was unsuitable for parole and would pose an unreasonable risk of danger to society and a threat to public safety. The Board based its decision on several factors, including his commitment offense and previous record of violence, among other factors.

(Lodgment 3 at 1.)

**B.    Procedural Background**

On September 26, 2008, Petitioner filed a Petition for Writ of Habeas Corpus in the County of Los Angeles Superior Court. (Lodgment 2.) On November 12, 2008, the Superior Court of Los Angeles denied the Petition, finding some evidence supported the Board's determination Petitioner was not suitable for parole. (Lodgment 3.) On December 1, 2008, Petitioner filed a Petition for Writ of Habeas Corpus in the California Court of Appeals for the Second District, Division Seven. (Lodgment 4.) On December 11, 2008, the Court of Appeal denied the Petition. (Lodgment 5.) On December 23, 2008, Petitioner filed a Petition for Writ of Habeas Corpus in the California Supreme Court. (Lodgment 6.) On June 17, 2009, the California Supreme Court summarily denied the Petition. (Lodgment 7.)

On September 21, 2009, Petitioner filed a Petition for Writ of Habeas Corpus in this Court. (Doc. 1.) On January 27, 2010, Respondent filed an Answer. (Doc. 9.) On February 23, 2010, Petitioner filed his Traverse. (Doc. 11.)

## III. DISCUSSION

**A.    Legal Standards For Federal Habeas Relief**

A federal court "shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Federal habeas courts are bound by a state's interpretation of its own law. Estelle, 502 U.S. at 68 (federal courts may not reexamine state court determinations on state-law questions); Jackson, 921 F.2d at 885 (federal courts "have no authority to review a state's application of its own laws"); see Oxborrow v. Eikenberry, 877 F.2d 1395, 1400 (9th Cir.1989) ("errors of state law do not concern us unless they rise to the level of a constitutional violation").

//

1    Federal habeas petitions filed after April 24, 1996 are governed by the Antiterrorism and
2 Effective Death Penalty Act of 1996 ("AEDPA").  See Lindh v. Murphy, 521 U.S. 320, 322-23, 117
3 S.Ct. 2059, 138 L.Ed.2d 481 (1997). AEDPA establishes a " 'highly deferential standard for
4 evaluating state-court rulings,' " requiring "that state-court decisions be given the benefit of the
5 doubt."  Woodford v. Visciotti, 537 U.S. 19, 24, 123 S.Ct. 357, 154 L.Ed.2d 279 (2002), quoting
6 Lindh, 521 U.S. at 333 n. 7.  The petitioner has "the burden of rebutting the presumption of
7 correctness by clear and convincing evidence."  28 U.S.C. § 2254(e) (1).  Federal habeas relief is
8 warranted only if the result of a claim adjudicated on the merits by a state court "was contrary to, or
9 involved an unreasonable application of, clearly established Federal law, as determined by the
10 Supreme Court of the United States," or "was based on an unreasonable determination of the facts in
11 light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d); see Bell v.
12 Cone, 535 U.S. 685, 694, 122 S.Ct. 1843, 152 L.Ed.2d 914 (2002).  A state court's adjudication
13 "based on a factual determination will not be overturned on factual grounds unless objectively
14 unreasonable in light of the evidence presented in the state court proceeding."  Miller-El v. Cockrell,
15 537 U.S. 322, 340, 123 S.Ct. 1029, 154 L.Ed.2d 931 (2003), citing 28 U.S.C. § 2254(d)(2).  A
16 federal court applies AEDPA standards to the "last reasoned decision" by a state court. Campbell v.
17 Rice, 408 F.3d 1166, 1170 (9th Cir.2005);  see Ylst v. Nunnemaker, 501 U.S. 797, 803, 111 S.Ct.
18 2590, 115 L.Ed.2d 706 (1991) ("Where there has been one reasoned state judgment rejecting a
19 federal claim, later unexplained orders upholding the judgment or rejecting the same claim rest upon
20 the same ground").

21    **B.    Due Process And Review Standards Applicable To Denials Of Parole**
22       **1.    Federal Standards Of Review**
23    A due process claim raises two questions: "the first asks whether there exists a liberty or
24 property interest which has been interfered with by the State; the second examines whether the
25 procedures attendant upon that deprivation were constitutionally sufficient."  Kentucky Dep't of
26 Corrections v. Thompson, 490 U.S. 454, 460, 109 S.Ct. 1904, 104 L.Ed.2d 506 (1989) (citations
27 omitted).  "[A]n individual claiming a protected interest must have a legitimate claim of entitlement
28 to it" arising either from "the Due Process Clause itself" or from "the laws of the States." Id.

(citation omitted). The en banc <u>Hayward</u> decision has clarified the standards federal habeas courts in this Circuit must apply in reviewing California prisoners' due process challenges to parole denials.[2] <u>Hayward</u>, 603 F.3d 546. That Opinion acknowledged that both the Ninth Circuit and the California Supreme Court "have been engaged in modification of the law to determine what limits there are on denial of parole." <u>Id.</u> at 552 ("Hayward's appeal addresses what if anything the federal Constitution requires as a condition of denial of parole"), citing 28 U.S.C. § 2254(a).

In particular, one question presented was whether "federal constitutional law imposes on the states a requirement for some quantum of evidence to support a state's denial of parole." <u>Hayward</u>, 603 F.3d at 549. The majority opinion distinguished the deprivation of good time credits earned by prisoners while incarcerated, creating "a liberty interest of the most fundamental sort," from denial of release on parole, a decision entailing the "discretionary assessment of a multiplicity of imponderables."[3] <u>Id.</u> at 557. The <u>Hayward</u> majority held: "in the absence of state law establishing otherwise, there is no federal constitutional requirement that parole be granted in the absence of 'some evidence' of future dangerousness or anything else."[4] 603 F.3d at 561, 563 ("We overrule any decisions suggesting that the federal constitution imposes a requirement of 'some evidence' of future dangerousness without regard to state law").[5] Nevertheless:

---

[2] The Hayward en banc court also held petitioners need a Certificate of Appealability in order to appeal a district court's Order denying a writ of habeas corpus arising from the state's denial of parole. <u>Hayward</u>, 603 F.3d at 554-55.

[3] "The proposition that the Supreme Court has required 'some evidence' of anything derives from a misunderstanding of the differences between 'good time' and 'parole.' " <u>Hayward</u>, 603 F.3d at 555, n. 44 ( "<u>Compare</u> <u>Superintendent v. Hill</u>, 472 U.S. 445, 105 S.Ct. 2768, 86 L.Ed.2d 356 (1985) (assessing a Massachusetts good time statute) with <u>Board of Pardons v. Allen</u>, 482 U.S. 369, 107 S.Ct. 2415, 96 L.Ed.2d 303 (1987) (assessing the Montana parole system) and <u>Greenholtz v. Inmates of Neb. Penal & Corr. Complex</u>, 442 U.S. 1, 99 S.Ct. 2100, 60 L.Ed.2d 668 (1979) (assessing the Nebraska parole system)") (parallel citations omitted).

[4] The "right in California to parole in the absence of some evidence of one's future dangerousness to the public arises from California law." <u>Hayward</u>, 603 F.3d at 563. The en banc majority declined to decide "whether the California parole scheme establishes a predicate for imposing [the liberty interest] as a matter of federal constitutional law." <u>Id.</u> at 562 (finding it need "not decide whether a right arises in California under the United States Constitution to parole in the absence of some evidence of future dangerousness" because "State law already does what Hayward would have federal constitutional law do").

[5] "To the extent our prior decisions including <u>Biggs v. Terhune</u>, 334 F.3d 910 (9th Cir.2003), <u>Sass v. California Board of Prison Terms</u>, 461 F.3d 1123 (9th Cir.2006), <u>Irons v. Carey</u>, 505 F.3d 846, 850-51 (9th Cir.2007) and our panel decision in this case might be read to imply that there is a federal constitutional right regardless of whether state law entitles the prisoner to release, we reject that reading and overrule those decisions to the extent they may be read to mean that." <u>Hayward</u>, 603 F.3d at 555 (footnotes omitted) (vacating the <u>Hayward</u> panel decision).

> Although the due process clause does not, by itself, entitle a prisoner to parole in the absence of some evidence of future dangerousness, *state law may supply a predicate for that conclusion.* "[D]espite the necessarily subjective and predictive nature of the parole-release decision, state statutes may create liberty interests in parole release that are entitled to protection under the Due Process Clause."

Hayward, 603 F.3d at 561, adding emphasis and quoting Allen, 482 U.S. at 371.

The Ninth Circuit succinctly extracted pertinent holdings from the Hayward opinion in Pearson v. Muntz, 606 F.3d 606 (9th Cir.2010). Federal courts "must apply the California 'some evidence' test on federal habeas review under AEDPA." Id. at 608. It is the "state law that gives rise to 'interests' on the part of state prisoners that may be enforced as a matter of federal law." Id. at 609. "[F]ederal habeas courts must 'decide whether the California judicial decision approving the governor's decision rejecting parole[6] was an "unreasonable application" of the California "some evidence" requirement, or was "based on an unreasonable determination of the facts in light of the evidence." ' " Id. at 608, quoting Hayward, 603 F.3d at 563. "By holding that a federal court may review the reasonableness of the state court's application of the California 'some evidence' rule, Hayward necessarily held that compliance with the state requirement is mandated by federal law, specifically the Due Process Clause." Id. at 609.

Inasmuch as " Hayward specifically commands federal courts to examine the reasonableness of the state courts' application of the California 'some evidence' requirement, as well as the reasonableness of the state court's determination of the facts in light of the evidence," the federal court must examine "how the state court applied the requirement." Pearson, 606 F.3d at 609, quoting Hayward, 603 F.3d at 562-63. A parole denial is not justified "merely because the state court purported to identify some evidence of future dangerousness;" there must actually be " 'some evidence of future dangerousness' justifying the denial of parole." Id.

### 2. California Parole Statute And Standards

Under California law, prisoners subject to indeterminate life sentences "may serve up to life in prison, but they become eligible for parole consideration after serving minimum terms of confinement." In re Dannenberg, 34 Cal.4th 1061, 1078, 23 Cal.Rptr.3d 417, 104 P.3d 783 (2005).

---

[6] The Governor may review the Board's parole decisions and is authorized to reverse or modify them, applying the same standards as the Board. Cal. Const. art. V, § 8, subd. (d); Cal.Penal Code § 3041.2.

"[L]ife inmates' actual confinement periods within the statutory range are decided by [the Board of Prison Terms]."[7] Id. The manner in which the Board is to make parole decisions is addressed in Cal.Penal Code § 3041 and implementing regulations. "Regardless of the length of time served, a life prisoner shall be found unsuitable for and denied parole if in the judgment of the panel [or the Governor] the prisoner will pose an unreasonable risk of danger to society if released from prison." Cal.Code Regs., tit. 15, § § 2281(a), 2402(a).[8] The Board "must apply detailed standards when evaluating whether an individual is unsuitable for parole on public safety grounds." Dannenberg, 34 Cal.4th at 1096 n. 16, 23 Cal.Rptr.3d 417, 104 P.3d 783; see also In re Rosenkrantz, 29 Cal.4th 616, 677, 128 Cal.Rptr.2d 104, 59 P.3d 174 (2002) (the Board's discretion is circumscribed by the requirement "the decision must reflect an individualized consideration of the specific criteria and cannot be arbitrary and capricious"). The regulations prescribe the treatment of evidence:

> All relevant, reliable information available to the panel shall be considered in determining suitability for parole. Such information shall include the circumstances of the prisoner's social history; past and present mental state; past criminal history, including involvement in other criminal misconduct which is reliably documented; the base and other commitment offenses, including behavior before, during, and after the crime; past and present attitude toward the crime; any conditions of treatment or control, including the use of special conditions under which the prisoner may safely be released to the community; and any other information which bears on the prisoner's suitability for release. Circumstances which taken alone may not firmly establish unsuitability for parole may contribute to a pattern which results in a finding of unsuitability.

Cal.Code Regs., tit. 15, §§ 2281(b), 2402(b).

//

---

[7] See Dannenberg, 34 Cal.4th at 1077-78, 23 Cal.Rptr.3d 417, 104 P.3d 783 (discussing the history of California's sentencing scheme, which had "for decades before 1977" employed an indeterminate sentencing system until the enactment of its Determinate Sentencing Law ("DSL") in 1976). Under the indeterminate scheme, the offender would receive "a statutory sentence expressed as a range between a minimum and a maximum period of confinement-often life imprisonment-the offender must serve." Id., at 1077, 23 Cal.Rptr.3d 417, 104 P.3d 783. The DSL "largely abandoned this system," so that "most felonies are now subject to three precise terms of years," with the sentencing court selecting from among the three alternatives (the lower, middle, or upper term). Id. at 1078, 23 Cal.Rptr.3d 417, 104 P.3d 783.

[8] "The two sections are identical." In re Lawrence, 44 Cal.4th 1181, 1202 n. 5, 82 Cal.Rptr.3d 169, 190 P.3d 535 (2008). Cal.Code Regs., tit. 15, § 2402 provides the Parole Consideration Criteria And Guidelines For Murders Committed On Or After November 8, 1978." Cal.Code Regs., tit. 15, § § 2281(a) provides the parole criteria and guidelines applicable to murderers whose crime was committed before then. The Lawrence court applied section 2281; the Rosenkrantz court applied section 2402.

The Board must consider both circumstances tending to show unsuitability[9] and circumstances tending to show suitability[10] in the particular case. The codified factors "are set forth as general guidelines" with "the importance attached to any circumstance or combination of circumstances in a particular case ... left to the judgment of the panel." Lawrence, 44 Cal.4th at 1203, 82 Cal.Rptr.3d 169, 190 P.3d 535, quoting Cal.Code Regs, tit. 15, § 2281, subds. (c), (d); see also Cal.Code Regs., tit. 15, § 2401 ("A parole date shall be set if the prisoner is found suitable for parole under Section 2402(d)," but "[a] parole date shall be denied if the prisoner is found unsuitable for parole under Section 2402(c)"). Although the Board must consider all available information pertinent to the codified factors in making its parole decision ( see Dannenberg, 34 Cal.4th at 1086, 23 Cal.Rptr.3d 417, 104 P.3d 783), "[i]t is not the existence or nonexistence of suitability or unsuitability factors that forms the crux of the parole decision; the significant circumstance is how those factors interrelate to support a conclusion of current dangerousness to the public." Lawrence, 44 Cal.4th at 1212, 82 Cal.Rptr.3d 169, 190 P.3d 535. "[I]t is not enough that there is some evidence to support the factors cited for the denial; that evidence must also rationally support the core determination required by the statute before parole can be denied, i.e., that a prisoner's release will unreasonably endanger public safety." In re Roderick, 154 Cal.App.4th 242, 263, 65 Cal.Rptr.3d 16 (2007). A decision denying parole must articulate reasons that are both grounded in evidence and rationally related to the statutory public danger basis for denial. Id. at 264, 65 Cal.Rptr.3d 16, citing In re Lee, 143 Cal.App.4th 1400, 1409, 49 Cal.Rptr.3d 931 (2006) ("Some evidence of the existence of a particular factor does not necessarily equate to some evidence the parolee's release unreasonably endangers public safety"). Due process of law is satisfied as long as the "*decision* is supported by" at least "a modicum of evidence." Rosenkrantz, 29 Cal.4th at 676-77, 128 Cal.Rptr.2d 104, 59 P.3d

---

[9] Guideline circumstances tending to show unsuitability include: (1) the heinousness or cruelty of the commitment offense; (2) the prisoner's previous record of violence, "particularly if the prisoner demonstrated serious assaultive behavior at an early age;" (3) unstable social history in relationships with others; (4) sadistic sexual offenses; (5) psychological factors; and (6) engaging in serious misconduct while incarcerated. Cal.Code Regs ., tit. 15, §§ 2402(c), 2281(c).

[10] Guideline circumstances tending to show suitability include: (1) no juvenile record; (2) reasonably stable social history; (3) signs of remorse, such as performing acts or giving "indications he understands the nature and magnitude of the offense;" (4) the crime was the result of significant personal stress; (5) lack of any significant history of violent crime; (6) the prisoner's present age as reducing the probability of recidivism; (7) realistic plans for the future upon release, or development of marketable skills usable upon release; and (8) institutional behavior "indicating an enhanced ability to function within the law upon release." Cal.Code Regs., tit. 15, §§ 2402(d), 2281(d).

174 (emphasis added).

The <u>Hayward</u> court summarized: "The California parole statute provides that the Board of Prison Terms 'shall set a release date unless it determines that the gravity of the current convicted offense or offenses, or the timing and gravity of current or past convicted offense or offenses, is such that consideration of the public safety requires a more lengthy period of incarceration for this individual.' " <u>Hayward</u>, 603 F.3d at 561, quoting Cal.Penal Code § 3041(b).

> As a matter of California law, "the paramount consideration for both the Board [of Prison Terms] and the Governor under the governing statutes is whether the inmate currently poses a threat to public safety." There must be "some evidence" of such a threat, and an aggravated offense "does not, in every case, provide evidence that the inmate is a current threat to public safety." The prisoner's aggravated offense does not establish current dangerousness "unless the record also establishes that something in the prisoner's pre- or post-incarceration history, or his or her current demeanor and mental state, supports the inference of dangerousness. Thus, in California, the offense of conviction may be considered, but the consideration must address the determining factor, "a current threat to public safety."

<u>Hayward</u>, 603 F.3d at 562 (footnotes omitted), quoting <u>Lawrence</u>, 44 Cal.4th at 1210, 1213-14.

The "crucial determinant of whether the prisoner gets parole in California is 'consideration of the public safety.' " <u>Hayward</u>, 603 F.3d at 561-62, citing <u>Lawrence</u>, 44 Cal.4th 1181, 82 Cal.Rptr.3d 169, 190 P.3d 535 and <u>In re Shaputis</u>, 44 Cal.4th 1241, 82 Cal.Rptr.3d 213, 190 P.3d 573 (2008) ("[T]he California Supreme Court established in [those] two decisions ... that as a matter of state law, 'some evidence' of future dangerousness is indeed a state *sine quo non* for denial of parole in California," creating a liberty interest). Once that "necessary predicate for denial of parole" is established by the evidence, the due process standard is satisfied. <u>Id</u>. at 552, 82 Cal.Rptr.3d 213, 190 P.3d 573. "There was some evidence of future dangerousness, so [Hayward's] parole was [properly] denied, and the district court correctly denied the writ." <u>Id.</u> at 563, 82 Cal.Rptr.3d 213, 190 P.3d 573.

While judicial review of a parole denial is "extremely deferential," the purpose of the review is to ensure the result was supported by "some evidence." <u>Hayward</u>, 603 F.3d at 562; <u>see also</u> <u>Rosenkrantz</u>, 29 Cal.4th at 660, 128 Cal.Rptr.2d 104, 59 P.3d 174; <u>Lawrence</u>, 44 Cal.4th at 1212, 82 Cal.Rptr.3d 169, 190 P.3d 535 ("when a court reviews a decision of the Board or the Governor, the relevant inquiry is whether some evidence supports the decision of the Board or the Governor that the inmate constitutes a current threat to public safety, and not merely whether some evidence

1  confirms the existence of certain factual findings") citing, *inter alia*, Rosenkrantz, 29 Cal.4th at 658,
2  128 Cal.Rptr.2d 104, 59 P.3d 174 and Dannenberg, 34 Cal.4th at 1071, 23 Cal.Rptr.3d 417, 104 P.3d
3  783. Thus, a reviewing court need only verify that evidence of the factors recited as the reasons for
4  denial supports the "core determination" the prisoner remains dangerous. Lawrence, 44 Cal.4th at
5  1212, 82 Cal.Rptr.3d 169, 190 P.3d 535.("Under the statute and governing regulations, the
6  circumstances of the commitment offense (or any of the other factors related to unsuitability)
7  establish unsuitability if, and only if, those circumstances are probative to the determination that a
8  prisoner remains a danger to the public"). The standard therefore requires a rational nexus between
9  the prisoner's "current circumstances" and his or her current dangerousness in order "to provide the
10 'modicum of evidence' necessary" for a legitimate denial of parole. Id. at 1227, 82 Cal.Rptr.3d 169,
11 190 P.3d 535 (setting aside the Governor's action in vacating the Board's grant of parole through
12 reliance on the "immutable and unchanging" circumstances of the "egregious" commitment offense,
13 on grounds that decision was not supported by "some evidence" of the prisoner's current
14 dangerousness).

15       In summary, the Due Process Clause of the Fourteenth Amendment of the United States
16 Constitution prohibits states from depriving persons of protected liberty interests without due
17 process of law. As construed by the Ninth Circuit in Hayward, California has created by statute a
18 liberty interest in the release on parole of eligible prisoners serving indeterminate life sentences
19 cognizable on federal habeas review. Denial of parole must comport with the state's "some
20 evidence" criteria linking the prisoner's current circumstances to the ultimate finding of present
21 dangerousness. The Hayward opinion articulates the standard for federal habeas review of state
22 court decisions upholding parole denials:

23 > Since the "some evidence" requirement applies without regard to whether the United States Constitution requires it, we in this case, and courts in this circuit facing the same issue in the future, need only decide whether the California judicial decision approving the governor's decision rejecting parole was an "unreasonable application" ... of the California "some evidence" requirement, or was "based on an unreasonable determination of the facts in light of the evidence."

26 Hayward, 603 F.3d at 562-63, quoting 28 U.S.C. §§ 2254(d) (1)-(2); see also Id. at 569, Berzon, J.,
27 concurring in part and dissenting in part (the "some evidence" rule must be applied in light of the
28 deference owed to the factual determinations of state courts under AEDPA).

### C.     The July 9, 2008 Subsequent Parole Suitability Hearing

On July 9, 2008, the California Board of Prison Terms held a subsequent parole suitability hearing to evaluate Petitioner's suitability for parole. (Lodgment 1.) During the hearing, the Board heard evidence regarding Petitioner's commitment offense, life history, his behavior and achievements while incarcerated, his mental health, and his post-release plans. (Id.) Petitioner was represented by attorney Scott Eadie at the hearing. (Id.) The Board of Parole denied Petitioner parole for two more years. (Id. at 77.)

At the outset, Petitioner elected not to talk about the details of his commitment offense.[11] (Lodgment 1 at 12-13.) Therefore, the Board read in, for the record, the facts of the crime, from the appellate decision. In detail, the Board recounted how Petitioner assisted his crime partner in beating and strangling the victim, Kelly Beasley, to death and then in disposing of her body. (Id. at 15.) Petitioner admitted he and his crime partner were drug dealers who worked together. (Id. at 17-20.) The Board focused on the fact that Petitioner's claim that he only participated in disposing of the victim's body was contradicted by witness statements and ultimately, the appellate decision. (Id. at 16.) When asked how he felt about the victim, Petitioner responded: "Well, at first, you know, doing my first years in the penitentiary, I couldn't really understand the pain of the victim's family, you know, losing— getting killed. But, excuse me–after my son was murdered, I could understand." (Id. at 21.)

Next, the Board reviewed Petitioner's social history. Petitioner grew up in Mississippi and spent four years in the Coast Guard. (Lodgment 1 at 24-27.) After the Coast Guard, Petitioner worked as a custodian at Aerospace Aviation and also worked at the airport base as a stocking clerk. (Id. at 28.) Petitioner admitted he does not receive many visitors in prison, but he stated he corresponds with his family by phone and by letter. (Id. at 29.) Petitioner mentioned he has two daughters, but that he does not speak with them often because he does not want to "put pressure on [them] because of [his] incarceration, I don't want to distract them on what they need to do in life, you know, because I know it's hurtful for them–me being locked up and can't be there with them."

---

[11] At the hearing, the Presiding Commissioner explained to Petitioner that he was not required to admit or discuss his commitment offense, and that the panel would not hold this against him. (Lodgment 1 at 11.) The Commissioner did explain, however, that the panel would accept the finding of the state court to be true. (Id.)

(Id. at 31-32.)  The Commissioner urged Petitioner to reconsider this, stating: "you're going to...need a support system, you know, when you get a date and you're going to need somebody out there to help you...you're going to have to depend on somebody [and] your family is the best one to depend on to help you get started."  (Id. at 32-33.)

With respect to Petitioner's criminal background, the Board noted he did not have a juvenile record.  (Id. at 33.)  The Board, however, discussed his arrests for theft of a vehicle and possession of burglary tolls, which were both dismissed.  (Id.)  In 1986, Petitioner served 30 days at Westside Honor Camp and received 24 months probation for corporal injury on a spouse for slapping his wife several times.  (Id. at 34.)  In 1988, Petitioner's probation was revoked and he spent 90 days in jail for corporal injury upon his girlfriend.  (Id.)  Petitioner admitted he was under the influence of alcohol during the commission of both offenses.  (Id. at 34-35.)

Turning to Petitioner's progress since his last hearing in July 2005, when he was given a three-year denial, Deputy Commissioner Cox commended Petitioner for having remained discipline-free and never receiving a CDC 115 or a 128. (Lodgment at 36.)  Further, the Board discussed Petitioner's vocations in the optic technician lab and bakery, as well as his certification as a forklift operator, his FEMA courses, his participation in the Convicts Reaching out to People (CROP) program, hands of peace conflict resolution, and Kairos.  (Id. at 36-39.)  A laudatory chrono related to Petitioner's involvement in CROP states: "Inmate Shedd has been an invaluable part of the Convicts Reaching Out to People Program.  He uses his life experience with high risk use to try to discourage them from making the poor decisions and choices that he made during his life."  (Id. at 40.)  Further, the Board noted Petitioner has completed 4500+ hours in the bakery as an oven operator and.  (Id. at 41.)  A supervisor stated, "Through the years, Inmate Shedd worked always with a positive attitude and respect towards staff and never been a problem with his peers.  He is viewed as a critical employee, has extensive special training in the position and is excellent at his job."  (Id. at 43-44.)

The Board also reviewed a psychological evaluation dated May 28, 2008, prepared by prison psychologist Steven B. Renfield, Ph.D.  (Lodgement 1 at 45.)  The evaluation describes Petitioner's history of substance abuse, particularly with alcohol and cocaine.  (Id.)  The evaluation states

Petitioner has a low score for psychopathy relative to incarcerated adult male offenders, low risk for re-offending, and low risk for recidivism. (Id. at 46.) However, the evaluation lists the following historical factors that contribute to an elevated risk for Petitioner: (1) his commitment offense was especially violent; (2) he had a serious drug problem; and (3) he had relationship problems which resulted in charges of spousal abuse and separation from wife and family. (Id.) The doctor also went on to discuss the following factors, which would lessen Petitioner's risk: (1) he stopped using drugs; (2) self-control; (3) pro-social training; (4) he has never had a negative behavior report while incarcerated; (5) and he has held jobs for long periods of time with good reports. (Id. at 47.) The report also states Petitioner "demonstrates remorse for his part in the offense and shows insight to both external and internal factors related to the offense. He is able to acknowledge and admit to his pressure or the negative influences of others. He is able to acknowledge and admit to his current faults and mistakes. He seems to be proactive in making better choices. He has consistently participated in AA and NA programs." (Id.) Overall, the doctor concluded Petitioner's risk for future violence and re-offending in the community is low. (Id. at 50.)

The Board took issue with the doctor's statement that Petitioner consistently participated in substance abuse programs. The Board noted Petitioner's participation in substance abuse programs has been sporadic. (Id. at 40-44; 47-48.) When asked about his limited participation in AA and NA meetings, Petitioner responded that lock-downs and his placement at a level four prison impeded his attendance. (Id. at 48.)

Turning to his parole plans, Petitioner stated he had contacted a few friends and received one letter from an old high school friend in California. (Lodgment 1 at 51.) The Board also notified Petitioner that an elderly third cousin wrote a letter stating she would support Petitioner any way she could. (Id. at 51-52.) Petitioner indicated that although he did not have a job offer, he had spoken with a friend about working with him in his surveying business. (Id. at 54.) The Board noted the fact Petitioner had contacted the National Coalition for Homeless Veterans, which is in San Diego, but suggested Petitioner find out what is available in Los Angeles and contact them specifically . (Id. at 55-56.)

//

Next, the District Attorney present at the hearing asked whether Petitioner was under the influence of alcohol or any other substance when he committed the crime, to which Petitioner stated he was under the influence of alcohol and cocaine. (Lodgment 1 at 60.) The District Attorney testified Petitioner was unsuitable for parole in light of the brutal life crime, the discrepancy between the Petitioner's version of events and the facts cited in the probation report and in the appellate decision, the domestic violence crimes he committed which also revolved around alcohol and cocaine, his sporadic attendance at AA and NA meetings, and his uncertain parole plans. (Id. at 62-63.)

After reviewing the foregoing evidence, the Board determined Petitioner was unsuitable for parole and would pose an unreasonable risk and danger to society if released from prison. The Board based this determination on the following findings:

> The first one is the commitment offense itself...It became pretty clear to the panel when we did go back and review the file that it showed that you were a willing participant and there [were] also witnesses that clarified that...Now in talking about the crime, this was probably an especially vicious, cruel crime for the victim, Ms. Beasley, Kelly Beasly, age 26, literally, probably beat to death...[T]he record reflected that she was working for your crime partner as a drug seller and then on a couple of occasions, she didn't come back with either money or the drugs, and that's what led to her demise. So...she lost her life because she didn't bring back the money or the drugs that you and your business associate [were], in fact, having her do...We note for the record that you did have a couple of arrests for violence...domestic violence on your spouse; one on your wife and one on your girlfriend. When you were granted probation and which you failed to profit from society's previous attempt to correct your criminality, because you did have probation for those two offenses....On your institutional behavior, you programmed fairly well.  I must say that, especially in the field of working...You have what's really astonishing about your record is the fact that you've had no counseling chronos or no 115s, even with your violent past...There is, however though, a concern of the panel is that you have not been sufficiently involved in AA/NA because of the GAF that you had...Anything that you can get involved with to show, on a continuous basis, that you are involved in substance abuse because I think that's one of your triggers...[W]e're encouraging you very strongly to get involved with self-help...Additionally, we think your parole plans need to be firmed up. You need to get some letter out there...[Y]ou have marketable skills but you don't have any–a job. When you don't have a job, you can easily revert back to selling drugs and everything. It would look a lot better on this side if you had all of that when you go back up and, also, a place to stay...[T]he bottom line is we feel that you have not completed the necessary programming that is necessary or is the central your adjustment.

(Lodgment 1 at 65-76.)

**D.  The State Courts' Result Approving The Board's Denial Of Parole Satisfies Due Process**

As established above, the Due Process Clause of the Fourteenth Amendment of the United States Constitution prohibits states from depriving persons of liberty interests without due process of

1  law. As construed by the Ninth Circuit in <u>Hayward</u>, California has created by statute for state
2  prisoners serving indeterminate life sentences a liberty interest in release on parole cognizable on
3  federal habeas review. In order to satisfy due process, "some evidence" of present dangerousness
4  must support the denial of parole. Since the "some evidence" requirement applies without regard to
5  whether the United States Constitution requires it, this Court, and courts in this circuit facing the
6  same issue in the future, need only decide whether the California judicial decision approving the
7  Board's decision rejecting parole was an "unreasonable application" of the California "some
8  evidence" requirement, or was "based on an unreasonable determination of the facts in light of the
9  evidence." <u>Hayward</u>, 603 F.3d at 562-63, quoting 28 U.S.C. §§ 2254(d)(1)-(2); <u>see also</u> <u>Id.</u> at 569,
10 Berzon, J., concurring in part and dissenting in part (the "some evidence" rule must be applied in
11 light of the deference owed to the factual determinations of state courts under AEDPA).

12      In the last reasoned state court decision, the Los Angeles Superior Court found there is
13 "some evidence to support the determination that the Petitioner currently presents an unreasonable
14 risk of danger to society and is, therefore, not suitable for release on parole." (Lodgment 3 at 1.)
15 Specifically, the Superior Court held:

> The Court finds there is some evidence to support the Board's findings that the victim was abused, that the offense demonstrated an exceptionally callous disregard for human suffering and that the motive was very trivial in relation to the offense. (citations omitted.) The Petitioner and his crime partner repeatedly threatened and beat the victim, which was extremely abusive. Further, they tied her up, gagged her, beat her for 30 minutes and then finally strangled her. This subjected the victim to prolonged pain, suffering and mental anguish, demonstrating an exceptionally callous disregard for her suffering. (citation omitted.) Also, the motive for the brutal murder was that the victim probably used the drugs given to her rather than sell them. This is a very trivial motive for beating and strangling her to death. There is no evidence to suggest that she posed any threat or physically harmed the Petitioner or his crime partner in any way.
>
> The Court also finds that there is some evidence to support the Board's finding that the Petitioner has a previous record of violence. (citations omitted.) The Petitioner was convicted of two separate domestic violence offenses against two women prior to the commitment offense. Each incident involved the Petitioner's abuse of alcohol.
>
> After a long period of time, a commitment offense may no longer indicate a current risk of danger to society in light of a lengthy period of positive rehabilitation. See *Lawrence*, *supra*, 44 Cal.4th at 1211. However, as discussed below, the Board considered other, current factors which weigh against his suitability. In cases, such as this one, where other factors indicate a lack of rehabilitation, the aggravated circumstances of the offense may provide some evidence of current dangerousness, even decades after it is committed. *Id.* at 1228.

28 //

1        The Board also considered the Petitioner's sporadic participation in substance abuse programs and his failure to have a coherent relapse prevention program, in light of the role of his substance abuse in each of his prior domestic violence incidents and the commitment offense. They also considered his somewhat unreliable parole plans, as well as his minimization of his role in the offense. While these factors, alone, may not justify a finding of unsuitability, the Board may properly consider them as they are relevant to a determination of whether the Petitioner is suitable for parole. (citation omitted.)

       The Board also considered the Petitioner's post-conviction gains, including his vocations in optic technician lab and bakery, his certification as a forklift operator, his FEMA courses, his participation in CROP and creative conflict resolutions, as well as his sporadic participation in Alcoholics Anonymous. Additionally, the Board considered the Petitioner's psychological report, which indicated that he is a low risk of future violence, as well as the fact that the Petitioner has never been disciplined in prison. However, they still concluded that Petitioner would pose an unreasonable threat to public safety. Penal Code § 3041(b). The Court finds that there is some evidence to support this determination because of the Petitioner's failure to participate regularly and meaningfully in substance abuse programming, his failure to develop a reasonable relapse prevention program, as well as his somewhat unreliable parole plans. These risk factors are similar to those that were present when the Petitioner was involved in the commitment offense and his prior violent offenses and indicate that he remains a risk of danger to society.

(Lodgment 3 at 2-3.)

    The Court finds there is "some evidence" to support the Board's finding that Petitioner is unsuitable for parole. The transcript of the July 2008 suitability hearing demonstrates the Board gave Petitioner individualized consideration of factors supported by evidence in the record tending to show suitability as well as those tending to show unsuitability. (Lodgment 1.) The panel explicitly based its determination to deny parole not only on the gravity and manner of Petitioner's commitment offense, but also on: his minimization of his role in the commitment offense ; the trivial motive for the commitment offense; Petitioner's previous record of violence; Petitioner's sporadic participation in substance abuse programs; Petitioner's failure to have a relapse prevention program; and Petitioner's unreliable parole plans. (Lodgment 1 at 65-76.) In particular, the Board expressed concern regarding Petitioner's sporadic participation in substance abuse programs and failure to have a solid relapse prevention program in light of the role of his substance abuse in both of his prior domestic violence incidents and the commitment offense. (Id. at 74-75.) The Court finds all those considerations are supported by the evidentiary record and supply the "something in the prisoner's pre- or post-incarceration history" and his "current demeanor and mental state" necessary to establish an inference of "present dangerousness," the "determining factor" for a denial of parole. Hayward, 603 F.3d at 562, quoting Lawrence, 44 Cal.4th at 1210, 1213-14.

1   Therefore, this Court's independent review of the hearing transcript and pertinent portions of the record reveals the parole denial "decision is supported by" at least "a modicum of evidence." Rozenkrantz, 29 Cal.4th at 676-77.  Accordingly, the state court decision approving the Board's denial of parole was not an unreasonable application of the California "some evidence" requirement, nor was it "based on an unreasonable determination of the facts in light of the evidence."  Hayward, 603 F.3d at 562-63, quoting 28 U.S.C. § 2254(d)(1)-(2).  Based thereon, the Court hereby RECOMMENDS the Petition be **DENIED**.

## IV. CONCLUSION

For the reasons set forth herein, it is RECOMMENDED that Petitioner's Petition for Writ of Habeas Corpus be **DENIED**.

This Report and Recommendation will be submitted to the United States District Court judge assigned to this case pursuant to the provisions of 28 U.S.C. § 636(b)(1).  Any party may file written objections with the Court and serve a copy on all parties on or before **December 22, 2010**.  This document should be captioned "Objections to Report and Recommendation."  Any reply to the objections shall be served and filed on or before **January 12, 2011**.  The parties are advised that failure to file objections within the specified time may waive the right to appeal the district court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

**IT IS SO ORDERED.**

DATED:  November 22, 2010

_____
LOUISA S PORTER
United States Magistrate Judge

cc:     The Honorable Janis L. Sammartino
        All parties